# WARNING LETTER

## Dexcom, Inc.

### MARCS-CMS 700835 — MARCH 04, 2025

 More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

**Delivery Method:**

VIA Electronic Mail

**Product:**

Medical Devices

**Recipient:**

Kevin R. Sayer

CEO & President

Dexcom, Inc.

6340 Sequence Drive

San Diego, CA 92121

United States

 ksayer@dexcom.com (mailto:ksayer@dexcom.com)

**Issuing Office:**

Center for Devices and Radiological Health

United States

## WARNING LETTER

CMS# 700835

March 4, 2025

Dear Mr. Sayer:

During inspections of your firms located in San Diego, CA on October 21, 2024, through November 7, 2024, and Mesa, AZ on June 10, 2024, through June 14, 2024, investigators from the United States Food and Drug Administration (FDA) determined that your firm manufactures the G6 and G7 continuous glucose monitors. Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

These inspections revealed that these devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820. We received responses from Charles R. Donlon, Senior Vice President, Quality Assurance on July 9, 2024; October 9, 2024; December 3, 2024; January 7, 2025; and January 10, 2025, concerning our investigators' observations noted on the Form FDA 483 (FDA 483), List of Inspectional Observations, that were issued to your firm on June 14, 2024, and November 7, 2024. We address these responses below, in relation to each of the noted violations. These violations include, but are not limited to, the following:

1. Failure to establish procedures for monitoring and control of process parameters for a validated process, as required by 21 CFR 820.75(b).

Specifically, your firm conducts functional acceptance testing, **(b)(4)**, on your Dexcom G6 and G7 Continuous Glucose Monitoring Systems. This testing accepts or rejects the glucose sensors based on values of glucose sensitivity slope, accuracy in the presence of acetaminophen (G6 only), and low oxygen response (G6 only); however, your firm has not established procedures to adequately monitor and control the glucose and acetaminophen concentrations used during the **(b)(4)** process.

For example,

a. Our investigators observed your firm does not monitor the glucose concentration of the glucose test dishes throughout production runs which run for approximately **(b)(4)**. The investigators also observed conditions which may cause fluctuation in concentration such as evaporation, carry over, and spillage.

b. Your procedures require dish **(b)(4)** to have an acetaminophen concentration of **(b)(4)** mg/dL; however, your firm does not have requirements to monitor this concentration during manufacturing of your devices. Additionally, your firm does not conduct monitoring for acetaminophen bias for your G7 devices.

We have reviewed your firm's responses and determined they are not adequate. Your firm's responses describe you have implemented **(b)(4)** and **(b)(4)** glucose concentration monitoring for each of your three manufacturing facilities for both G6 and G7 devices. Your responses also identify that your firm has implemented low O2 and acetaminophen testing across all Dexcom sensor manufacturing lines at your three manufacturing sites.

In addition to these changes your firm conducted a health hazard assessment HHA-SD-24-045 provided in your December 3, 2024, response as attachment E. This HHA shows your firm calculated the probability of the hazardous condition occurring using the global code "**(b)(4)**" for all hazardous situations covered under the HHA. However, multiple hazardous situations are evaluated which are likely to have different frequencies of occurrence and impact on glucose reading accuracy. In response to this letter, please provide a justification for this hazard assessment method.

In your firm's December 3, 2024, response, you provided a "Acetaminophen Specification Assessment RPT-1005056" report (Attachment D) to support that your firm's acetaminophen specification is associated with your **(b)(4)** testing. You provided the report to support your new specification that no less than **(b)(4)** mg/dL of acetaminophen concentration in dish **(b)(4)** is adequate to sufficiently challenge the sensor during **(b)(4)** testing. However, data in this report appears to be based on an allowable Maximum Interference Effect (MIE) of **(b)(4)** mg/dL of glucose equivalent as your **(b)(4)** acetaminophen acceptance criteria, and we are unable to determine, from your response, how this MIE was established. Further, an MIE of **(b)(4)** mg/dL is wider than the clinical interference performance with an MIE of **(b)(4)** mg/dL from the clinical interference study provided as part of DEN170088, assuming an interstitial fluid (ISF) acetaminophen concentration of **(b)(4)** mg/dL stated on your provided literature. Therefore, the Acetaminophen Specification Assessment

RPT-1005056 report does not appear to show the established acetaminophen setpoint of **(b)(4)** mg/dL is adequate to show manufactured sensors will demonstrate the same clinical performance as established in the premarket clinical study. Additionally, please provide PTL-902020 and RPT-905004 in response to this letter.

2. Failure to establish procedures to adequately validate a process whose results cannot be fully verified by subsequent inspection and test, as required by 21 CFR 820.75(a).

For example,

a. Your firm's test method validation for the **(b)(4)** System is documented in Test Method Validation for **(b)(4)** System (PTL-902713, Rev. 001) and reported in **(b)(4)** Test Method Validation Report (RPT-904480, Rev. 001). The documents show your firm conducted this validation by testing **(b)(4)** sensors by **(b)(4)** operators and documented the results as pass/fail, rather than documenting the measured results. The test method validation does not support the method is capable for producing repeatable or reproducible results.

b. During this inspection, your firm provided a memo stating the error in the glucose slope generated by the **(b)(4)** system is approximately **(b)(4)** based on the uncertainty in experimental conditions. Furthermore, the permissible deviation from linearity when calibrating the **(b)(4)** analyzer used to measure the concentration of the glucose solutions in the **(b)(4)** system is **(b)(4)**. Your firm failed to incorporate this measurement uncertainty of your **(b)(4)** process into the acceptance criteria for slope to ensure that nonconforming sensors are not inadvertently accepted on the lower and/or upper bounds of the test.

c. Your firm failed to validate the manufacturing specifications for the concentration of glucose in the dishes used as part of your **(b)(4)** test.

We have reviewed your responses and cannot determine the adequacy of your response at this time. Your responses state your firm is investigating the variability in your **(b)(4)** test method and provided the results of **(b)(4)** testing which confirms variability in the test method. The responses state additional investigation and testing is needed to reduce the variability and provide target timeframes for test method development and process specification changes through May 2025. We request you provide ongoing updates to these activities through completion.

Additionally, your firm's responses reference the same HHA described in item 1 of this letter. See above for a description of our evaluation.

3. Failure to adequately establish procedures for design input, as required by 21 CFR 820.30(c).

For example,

a. The special controls for integrated continuous glucose monitoring systems defined in 21 CFR 862.1355(b) apply to your G6 and G7 CGMs. Your design inputs do not clearly define all of these requirements to ensure appropriate design control activities can be conducted. Specifically, your firm has not defined appropriate design input requirements for manufacturing controls and acceptance criteria for your **(b)(4)** system for slope and mean absolute relative distance (MARD).

b. The predicted initial and final *in vivo* sensitivities of the glucose sensors (M0 and Mf, respectively) for the Dexcom G6 and Dexcom G7 CGM Systems are calculated using *in vitro* slope measurements obtained through the **(b)(4)** system. Your firm documented design input for initial glucose sensor sensitivity; however, your firm failed to document requirements for the expected 10.5-day lifetime of the devices.

We have reviewed your response and determined it is inadequate. Your firm's response acknowledges your firm's failure to adequately document the special control requirements as design inputs for the G6 and G7 CGMs. We acknowledge your firm has updated your primary design input documents to reference these special controls more explicitly. Your firm's response commits to fully developing trace matrices for application of the special controls through CAPA-000464. We request you continue to provide updates to this CAPA through completion and include the established trace matrices when finalized.

Your response states you have changed the **(b)(4)** MARD specification to **(b)(4)**% for both the G6 and G7 based on specification associated with the pivotal clinical study for the G6. However, your response does not adequately support the use of the same data from the G6 pivotal study to support the G7 device because the two sensors use different glucose algorithms which can impact the sensitivity to MARD. Additionally, only specifying the upper limit of MARD could result in all commercial sensors being released with borderline acceptable MARD. The clinical sensors' MARD followed a certain distribution with only **(b)(4)**% as the extreme case from a few sensors. CGM sensors exhibit varying degree of clinical accuracy and MARD is an important parameter to ensure sensor accuracy. Therefore, a single parameter of maximum MARD is inadequate to ensure the labeled clinical performance. Additional parameters are needed to ensure that the mean/median MARD and standard deviation of commercial production is representative of the clinical performance as claimed in the premarket submission.

Your response states you have established a new specification for Mo and Mf to be **(b)(4)**% based on data from numerical simulation studies. Your response states you have also initiated **(b)(4)** testing as of December 1, 2024, for your chemical formulation qualification (CFQ) and will be implementing sensor lot acceptance testing upon implementation of the **(b)(4)** Testing. We acknowledge your response states you will continue to evaluate enhancements to your test and requirements for sensitivity. However, as your firm has not been routinely collecting Mf data during production or during your pivotal studies, we remain concerned you do not have necessary data to support the basis for your new Mo and Mf specifications. In your response to this letter, please describe what specific actions your firm is planning to further evaluate and validate this specification.

4. Failure to establish procedures for design changes, as required by 21 CFR 820.30(i).

Specifically, your firm conducted a design change to a component used in the resistance layer of your sensors from **(b)(4)** to **(b)(4)**. This change is a significant change and your firm failed to adequately evaluate and validate this change. Your firm conducted a clinical study (**(b)(4)**) to determine the equivalence of these two components; this study resulted in determining your primary endpoints were not met. You conducted additional *in vivo* studies to attempt to further characterize the equivalence of these components; however, data from TDR-1000254 shows **(b)(4)** performs worse than **(b)(4)** for accuracy. Your firm began commercial manufacturing of Dexcom G7 CGMs with **(b)(4)** on **(b)(4)**.

We have reviewed your response and determined it is inadequate. In response to this observation your firm provided new testing, including Sensor Level Performance Equivalency of **(b)(4)** and **(b)(4)**. Section 5.5 Glucose Sensitivity shows the standard deviation (SD) of **(b)(4)** glucose sensitivity is twofold that of **(b)(4)**. This indicates significant variation in the clinical performance of sensors manufactured using **(b)(4)**. Your response does not appear to include evidence to support sensors containing **(b)(4)** perform as claimed in the G7 original 510(k) K213919 where the pivotal clinical study used exclusively **(b)(4)** sensors.

Additionally, your response states your firm has ceased commercial distribution of G7 sensors containing **(b)(4)**; however, it does not address G6 sensors containing **(b)(4)**. We request you provide information on how you will address any remaining sensors containing **(b)(4)** in commercial distribution.

5. Failure to adequately establish procedures for design output, as required by 21 CFR 820.30(d).

Specifically, your firm failed to establish adequate specifications for **(b)(4)** and **(b)(4)** of the sensor coating used in the manufacture of your G6 and G7 CGM devices. Your firm conducts in-process sampling of **(b)(4)** sensors and has acceptance criteria for an average thickness across the **(b)(4)** sensors; however, you have not established criteria for individual sensors.

We have reviewed your response and cannot determine its adequacy at this time. Your response includes records showing you have not established CFQ and in-process acceptance criteria for thickness of the **(b)(4)** and **(b)(4)** of your sensors. We acknowledge your response states additional analysis of the ranges for this thickness specification are ongoing. We request you continue to provide updates into this analysis as your corrective actions progress.

6. Failure to establish adequate procedures for design validation to ensure that devices conform to defined user needs and intended uses, as required by 21 CFR 820.30(g).

Specifically, your firm failed to establish procedures for adequate risk analysis for your G6 and G7 CGM devices. For example, your hazard analyses for your G6 and G7 devices (RA-000258 Rev. 033 and RA-000548 Rev. 41, respectively) do not address hazards and risks associated with the use of your device with automated insulin dosing (AID) systems which are commonly used with your G6 and G7 CGM devices.

We have reviewed your responses and cannot determine the adequacy at this time. Your responses provide records showing you have updated your various risk documents to include assessments of hazards and risks associated with the use of your devices with AID systems. We acknowledge your response states you are working with your AID pump partners to better inform this analysis and expect additional complaint data to inform this activity through March 2025 and plan for an update to the new AID Interoperability System Hazard Analysis, RA-1000096 by June 2025. We request you continue to provide updates in response to this letter.

7. Failure to establish adequate procedures for corrective and preventive actions, as required by 21 CFR 820.100(a).

For example, your firm initiated CAPA-000426 on April 19, 2024, after identifying a dissolved oxygen content in **(b)(4)** for the G6 was outside of specification. This CAPA investigation determined your firm was not consistently monitoring or recording the values of dissolved oxygen, notifying management of out of specification results, or consistently scrapping affected sensors when identified. The CAPA also found this deficiency was consistent across both your San Diego, CA and Mesa, AZ facilities. In your CAPA investigation your firm limited your evaluation to **(b)(4)** lots of G6 sensors potentially impacted by the deficiency, despite finding all lots may have been potentially impacted.

We have reviewed your firm's response and determined it is inadequate. Your firm's response states you have now reviewed the DHRs for all G6 products manufactured in San Diego, CA and Mesa, AZ for the last **(b)(4)** and conducted a review of research studies which you state supports your firm's assessment that no further action for impacted product is necessary. However, your response does not provide the support documentation of these reported reviews. Additionally, your firm's response states your firm has revaluated the associated HHA (HHA-MA-24-002) and concluded that the residual risks are acceptable. The Benefit-Risk Analysis section of the HHA states that "**(b)(4)**." The HHA also references a publication (Facchinetti, A., Del Favero, S., Sparacino, G., & Cobelli, C. (2016). Modeling Transient Disconnections and Compression Artifacts of Continuous Glucose Sensors. Diabetes Technology & Therapeutics, 18(4), 264–272) based on clinical data extracted from the 2011 Dexcom G4 Platinum CGM pivotal study and concluded that the median (**(b)(4)** percentiles) duration of a compression artifact is **(b)(4)** and therefore potential of a hyperglycemic event is minimal. However, we do not agree with your rationale that your algorithm provides adequate mitigation for low oxygen (compression) events by blanking sensor data or providing low glucose alarms. A hypoxic environment due to compression may develop slowly and, in many cases, will not result in either data blanking or a low glucose alarm. As presented in your referenced literature, the median (**(b)(4)**) bias during compression events is **(b)(4)** mg/dL, which means that these events do not result in data blanking and the magnitude of such negative biases would not necessarily lead to a

low glucose alarm being triggered if the CGM value (EGV) is still above the low alarm threshold. Therefore, we do not agree that the residual risks are acceptable as users may be able to view the inaccurate CGM readings and make inappropriate diabetes management decisions if a non-conforming product is being used.

Our inspection revealed that the G6 and G7 Continuous Glucose Monitoring Systems are adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have approved applications for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or approved applications for an investigational device exemption under section 520(g) of the Act, 21 U.S.C. § 360j(g). The devices are also misbranded under section 502(o) the Act, 21 U.S.C. § 352(o), because your firm introduced or delivered for introduction into interstate commerce for commercial distribution these devices with major changes or modifications to the devices without submitting a new premarket notification to FDA, as required by section 510(k) of the Act, 21 U.S.C. § 360(k), and 21 CFR 807.81(a)(3). Specifically, your firm modified the G6 and G7 sensors by replacing the **(b)(4)** with **(b)(4)** used in the **(b)(4)**. The G6 device was originally cleared under K182041 and the G7 device was originally cleared under K213919. The pivotal clinical studies submitted in the original 510(k) submissions for these devices used exclusively **(b)(4)** sensors. The **(b)(4)** is a critical component in G6 and G7 sensors. Your firm also conducted two clinical studies which demonstrated that performance of sensors constructed with **(b)(4)** had significantly greater variability than that of sensors constructed with **(b)(4)**. Additionally, as discussed in item 4 above, your December 3, 2024, response includes the Sensor Level Performance Equivalency of **(b)(4)** and **(b)(4)**, which shows a significant difference in the standard deviation (SD) of glucose sensitivities between sensors built with **(b)(4)** and **(b)(4)**. This difference in SD indicates greater clinical performance variation for sensors with **(b)(4)**. The larger inaccuracies in **(b)(4)**-coated sensors cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions. Therefore, we do not agree your firm has shown equivalency between **(b)(4)** and **(b)(4)** to justify that such a change does not require a new premarket submission. The variability differences could significantly affect the safety or effectiveness of the device within the meaning of 21 CFR 807.81(a)(3). Accordingly, your firm was required to submit a new premarket notification submission under section 510(k) of the Act, 21 U.S.C. § 360(k), to FDA at least 90 days before you proposed to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of the modified G6 and G7 sensors. Additionally, your response commits to ceasing distribution of the G7 sensors with **(b)(4)** until additional testing is completed; however, it does not address the G6 sensors with **(b)(4)**. Your response also does not commit to submitting a new premarket submission for the change to **(b)(4)** for either the G6 or G7 devices.

For a device requiring premarket approval, the notification required by section 510(k) is deemed satisfied when a PMA is pending before the agency. 21 CFR 807.81(b). The kind of information that your firm needs to submit in order to obtain approval or clearance for the device is described on the Internet at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/default.htm. The FDA will evaluate the information that your firm submits and decide whether the product may be legally marketed.

A follow up inspection will be required to assure that corrections and/or corrective actions are adequate.

Your firm should take prompt action to address any violations identified in this letter. Failure to adequately address this matter may result in regulatory action being initiated by the FDA without further notice. These actions include, but are not limited to, seizure, injunction, and civil money penalties.

Other federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts. Additionally, should FDA determine that you have Quality System regulation violations that are reasonably related to premarket approval applications for Class III devices, such devices will not be approved until the violations have been addressed. Should FDA determine that your devices or facilities do not meet the requirements of the Act, requests for Certificates to Foreign Governments (CFG) may not be granted.

Please notify this office in writing within fifteen business days from the date you receive this letter of the specific steps your firm has taken to address the noted violations, as well as an explanation of how your firm plans to prevent these violations, or similar violations, from occurring again. Include documentation of the corrections and/or corrective actions (which must address systemic problems) that your firm has taken. If your firm's planned corrections and/or corrective actions will occur over time, please include a timetable for implementation of those activities. If corrections and/or corrective actions cannot be completed within fifteen business days, state the reason for the delay and the time within which these activities will be completed. Your firm's response should be comprehensive and address any violations included in this Warning Letter. If you believe that your products are not in violation of the FD&C Act, include your reasoning and any supporting information for our consideration as part of your response.

Your firm's response should be sent to Jessica Mu, Assistant Director, Establishment Assessment Team 3. Refer to the Unique Identification Number CMS 700835 when replying. If you have any questions about the contents of this letter, please contact: Jeff Wooley, Compliance Officer at 214-253-5251 or Jeffrey.wooley@fda.hhs.gov.

Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your firm's facility. It is your firm's responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violations noted in this letter and in the Inspectional Observations, FDA 483, issued at the close of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality management systems. Your firm should investigate and determine the causes of any violations and take prompt actions to address any violations and bring the products into compliance.

Sincerely,
/S/

for RDML Sean M. Boyd, MPH, USPHS
Director
Office of Regulatory Programs
Office of Product Evaluation and Quality
Center for Devices and Radiological Health

Was this page helpful? * (required)

Yes

No

**Submit**

🇺🇸 An official form of the United States government. Provided by Touchpoints